In the Matter of the Accounting of KATHARINE D. GRUNER, as Administratrix with the Will Annexed of OTTO H. GRUNER, Deceased, Respondent.

NEW YORK TRUST COMPANY, Appellant; UNITED STATES OF AMERICA et al., Respondents.

Argued May 22, 1946; decided July 23, 1946.

*J. Adam Murphy* and *Robert Nelson Shiverts* for appellant. I. The assignment by the decedent to the trust company is not rendered invalid by the rule of *Benedict* v. *Ratner* (268 U. S. 353). (*Schwabacher* v. *Ehrich,* 168 Misc. 869, 254 App. Div. 847, 279 N. Y. 813; *Matter of Marchant* v. *Mead-Morrison M. Co.,* 252 N. Y. 284; *Hangen* v. *Hachemeister,* 114 N. Y. 566; *Russell* v. *Winne,* 37 N. Y. 591; *Potts* v. *Hart,* 99 N. Y. 168; *Frost* v. *Warren,* 42 N. Y. 204; *Skilton* v. *Codington,* 185 N. Y. 80; *Johanns* v. *Ficke,* 224 N. Y. 513; *Sexton* v. *Kessler,* 225 U. S. 90; *Matter of Bernard & Katz,* 38 F. 2d 40; *Manufacturers Finance Co.* v. *Armstrong,* 78 F. 2d 289; *McNeeley* v. *Welz,* 166 N. Y. 124; *Schermerhorn* v. *Gardenier,* 107 App. Div. 564, 184 N. Y. 612; *National Bank of Deposit* v. *Rogers,* 44 App. Div. 357, 166 N. Y. 380.) II. Assignment of a membership in a commercial exchange as collateral is valid. (*Matter of Worrall,* 79 F. 2d 88; *Rubin* v. *Whitney,* 162 Misc. 821; *O'Dell* v. *Boyden,* 150 F. 731; *Nashua Savings Bank* v. *Abbott,* 63 Mass. 1058; *Matter of Smith-Flynn Commission Co.,* 292 F. 465.) III. A membership upon the New York Stock Exchange is property which is transferable. (*Citizens National Bank* v. *Durr,* 257 U. S. 99; *Matter of Ulmann* v. *Thomas,* 255 N. Y. 506; *Powell* v. *Waldron,* 89 N. Y. 328; *Matter of Hearns,* 214 N. Y. 426; *Matter of Snow* v. *McLane,* 252 App. Div. 369; *Sterling* v. *Chapin,* 185 N. Y. 395; *Hyde* v. *Woods,* 94 U. S. 523; *Page* v. *Edmunds,* 187 U. S. 596; *Platt* v. *Jones,* 96 N. Y. 24; *Matter of Sand* v. *Beach,* 270 N. Y. 281; *Portuguese-American Bank* v. *Welles,* 242 U. S. 7.) IV. The lien of the trust company is prior to any claim of the United States or the State of New York. (*United States* v. *Oklahoma,* 261 U. S. 253; *United States* v. *Giger,* 26 F. Supp. 624; *Spokane County* v. *United States,* 279 U. S. 80; *United States* v. *Sullivan,* 19 F. Supp. 695.)

*Charles B. Clancy* and *Morrison T. Hankins* for Katharine D. Gruner, as administratrix, respondent. I. The purported assignment to the trust company created no legal or equitable lien. (*Benedict* v. *Ratner*, 268 U. S. 353; *Matter of M. J. Hoey & Co.*, 19 F. 2d 764; *Zartman* v. *First Nat. Bank*, 189 N. Y. 267.) II. A seat on the Stock Exchange may not be assigned. (*Schwabacher* v. *Ehrich*, 168 Misc. 869, 254 App. Div. 847, 279 N. Y. 813; *Ketcham* v. *Provost*, 156 App. Div. 477, 215 N. Y. 631; *N. Y. ex rel. Whitney* v. *Graves*, 299 U. S. 366.) III. The New York Stock Exchange constitution and by-laws do not recognize an assignment of membership or seat. (*N. Y. ex rel. Whitney* v. *Graves*, 299 U. S. 366; *Matter of M. J. Hoey & Co.*, 19 F. 2d 764.)

*John F. X. McGohey, United States Attorney* (*Thomas G. Donlan* of counsel), for United States of America, respondent. I. Under the Rules and Constitution of the New York Stock Exchange the appellant was not the holder of a valid assignment of the decedent's membership or the proceeds thereof. II. The purported assignment to the trust company is fraudulent as a matter of law. (*Benedict* v. *Ratner*, 268 U. S. 353; *Matter of M. J. Hoey & Co.*, 19 F. 2d 764.) III. The statutory priority of the United States is superior to the imperfect lien of the appellant. (U. S. Code, tit. 31, § 191; *Price* v. *United States*, 269 U. S. 492; *United States* v. *Texas*, 314 U. S. 480; *United States* v. *Waddill Co.*, 323 U. S. 353.)

*Nathaniel L. Goldstein, Attorney-General* (*Mortimer M. Kassell* and *Francis Kelliher* of counsel), for State of New York, respondent. I. The purported assignments to appellant created no legal or equitable lien and were void as against all other creditors of decedent. (*Multer* v. *State of New York*, 178 Misc. 360; *Schaefer Brewing Co.* v. *Amsterdam Tavern, Inc.*, 171 Misc. 352; *Alchar Realty Corp.* v. *Meredith Restaurant, Inc.*, 256 App. Div. 853; *Matter of Frank* v. *Lutton*, 267 App. Div. 703.) II. The State's right to preference in the distribution of an insolvent estate is superior to the rights of a creditor unless he has perfected a specific lien. (Surrogate's Court Act, § 212; Tax Law, § 352; *Matter of Atlas Television Co.*, 273 N. Y. 51; *Matter of McClatchey*, 170 Misc. 696; *Marshall* v. *New York*, 254 U. S. 380; *Matter of Brown Printing Co.*,

285 N. Y. 47; *Matter of Lincoln Chair & Novelty Co.,* 274 N. Y. 353; *Matter of Carnegie Trust Co.,* 206 N. Y. 390; *Matter of Smith* v. *Meader Pen Corp.,* 255 App. Div. 397, 280 N. Y. 554; *Spokane County* v. *United States,* 279 U. S. 80; *United States* v. *State Bank,* 6 Pet. [U. S.] 29; *United States* v. *Waddill Co.,* 323 U. S. 353; *United States* v. *Texas,* 314 U. S. 480.)

CONWAY, J. There is presented to us the question, among others, of the extent to which an equitable lien may be imposed upon a New York Stock Exchange seat and the remedy available for its enforcement by the assignee.

One Otto Harry Gruner on May 6, 1929, made an assignment to the New York Trust Company (hereinafter referred to as trust company) as security for a loan of $212,000, of all his right, title and interest in and to his membership and seat upon the New York Stock Exchange (hereinafter referred to as the exchange) in words which were in part as follows: " Said Otto H. Gruner hereby transfers, assigns and sets over to The New York Trust Company free and clear of any claims, liens or encumbrances whatsoever all his right, title and interest, legal and equitable, in and to a full membership and seat upon the New York Stock Exchange. This assignment, though absolute, is nevertheless an assignment as collateral and security for the demand note of said Otto H. Gruner in the amount of Two hundred and twelve thousand Dollars made simultaneously herewith.

" The intent hereof is to transfer to The New York Trust Company said membership and seat and to confer upon the New York Trust Company full right and power in its absolute discretion to dispose of said seat at any time without any notice to me and without advertisement by sale, public or private, or at auction, to be credited upon said note and any surplus over the amount due on said note and the expenses of sale to be paid to me. * * * "

Later, on April 21, 1933, but as of May 6, 1929, Gruner assigned the proceeds of the sale of the seat in words which were in part as follows: " Said Otto H. Gruner hereby transfers, assigns and sets over to The New York Trust Company, free and clear of any claims, liens or encumbrances whatsoever, all his right, title and interest in and to the proceeds of a

membership in and seat upon the New York Stock Exchange. This assignment, though absolute, is nevertheless an assignment as collaterial and security for the demand note of said Otto H. Gruner in the amount of $212,000 made simultaneously with the date hereof.

" The intent hereof is to assign and transfer to The New York Trust Company the full proceeds of said membership and seat to be credited upon said note and any surplus over the amount due on said note and the expenses of sale to be paid to the undersigned."

In each of those assignments there were the following clauses: " I agree to pay all dues and charges of every kind and character and to do everything necessary to keep said membership one in good standing and to suffer no obligations of any kind in favor of other members of the Stock Exchange, or any firm of which any member of the Stock Exchange may be a member, ever to take precedence over the rights of The New York Trust Company hereunder.

" I agree to maintain said membership and seat free of claim and liability for the payment of any obligation to any other member of the New York Stock Exchange or any firm to which any member of the New York Stock Exchange belongs or to anyone else."

On May 17, 1933, the trust company advised the exchange of the assignment and the exchange acknowledged receipt of its letter. Nothing turns upon the difference in the wording of the two assignments.

At the time of the death of Gruner in December, 1942, there was due the trust company $59,201.93 and on that day the seat had a value of $29,000. There were no charges against it in favor of the exchange, the members of the exchange, or customers of the decedent. The exchange sold the seat in March, 1944, for $49,000 and that sum was turned over to Gruner's administratrix *c.t.a.* under a stipulation that such action should be without prejudice to the rights of the trust company. The questions involved herein are presented upon the final accounting of the administratrix rather than in an action which had originally been brought by the trust company against the exchange and Katharine D. Gruner, individually and as administratrix, and which has been discontinued.

A seat on the exchange carries with it certain attributes of property — it is the subject of *ownership,* of *use,* and of *sale.* As was said in *Powell* v. *Waldron* (89 N. Y. 328, 331, 332) : "We think the right of the judgment debtor to a seat in the Cotton Exchange was property. That it had value was proved and is conceded; and that it could be transferred to a certain class of purchasers, under prescribed rules and conditions, is also established. The defendants took it as collateral to the note of Robbins and held it as security for that debt, and thereby plainly treated it as valuable property. Although of a character somewhat peculiar, its use restricted, its range of purchasers narrow, and its ownership clogged with conditions, it was nevertheless a valuable right, capable of transfer and correctly decided to be property." (See, also, *Matter of Hellman,* 174 N. Y. 254.) Under the provisions of the constitution of the exchange, a member may not transfer *ownership* of the seat to another without the consent of the committee on admissions, which elects new members. A member may not transfer the *use* of the seat to a nonmember since the privilege of trading at the exchange is a personal privilege which may be exercised only by the owner. (See *Platt* v. *Jones,* 96 N. Y. 24.)

We come then to the question of *sale.* The constitution of the exchange provides that upon a transfer of membership, the proceeds of the sale of the seat shall be applied by the exchange to payments of the following: (1) sums due the exchange (2) sums due the Stock Clearing Corporation (3) sums due other members or member firms arising from losses upon the closing out of member contracts (4) sums, in the discretion of the board of governors, which represent any unusual expenses incurred by the exchange in connection with litigation over the disposition of the proceeds of the seat. Provision is then made that the surplus of the proceeds shall be paid directly to the person whose membership is transferred or to his legal representative. The constitution of the exchange as it existed in 1929 is the applicable one here and it is therefore unnecessary to consider changes made by the constitution adopted in 1941. There is no provision in that constitution, which has been called to our attention, providing for the sale of a member's seat by a nonmember creditor. Nor has any rule or practice of the exchange been called to our attention under which the exchange may

institute involuntary transfer proceedings against a member because of his indebtedness to a nonmember. If such a proceeding be instituted by the committee on admissions on its own initiative against a member because of his indebtedness to other members, payments of the surplus of the proceeds of the sale must be made to the member, or his legal representative. It thus appears that, although the assignment purported to give the trust company power to sell the seat with or without notice to the assignor, that power could not be exercised except by the interposition of a court of equity by decree *in personam* compelling the co-operation of the assignor by directing him to take each and every step necessary to bring about the sale of his seat, since there is no provision in the constitution or rules of the exchange which makes co-operation of the committee on admissions available as to a nonmember. (*Matter of Ulmann* v. *Thomas* [LEHMAN, J.], 255 N. Y. 506, 512, and cases there cited; *Clute* v. *Loveland,* 68 Cal. 254 [where the rules of the San Francisco Stock and Exchange Board were more liberal]; *Nashua Savings Bank* v. *Abbott,* 181 Mass. 531; Meyer on the Law of Stock Brokers and Stock Exchanges, pp. 119–120.) In *Matter of Ulmann* v. *Thomas* (*supra*) we said (p. 512): " Membership in an exchange is property which may be reached by appropriate proceedings supplementary to execution or creditors' bills, but only where the court obtains jurisdiction by which it can compel an involuntary transfer. (See Freeman on Executions [3d ed.], § 110.) In *O'Dell* v. *Boyden* (150 Fed. Rep. 731) Judge LURTON stated: ' Only by decree *in personam* compelling the bankrupt member can such a transfer of membership be effectuated as will put the buyer in the place of Henrotin as a member.' (Cited with approval in *Chicago Board of Trade* v. *Johnson, supra.*) No such decree *in personam* can be made in these proceedings against a judgment debtor not within the jurisdiction."

When we come to the question of the *proceeds* of the *sale,* a different question is presented. Each member of the exchange has a right to the proceeds of the *sale* of his seat and that right may be assigned. (See *Field* v. *City of New York,* 6 N. Y. 179; *Hinkle Iron Co.* v. *Kohn,* 229 N. Y. 179.) After the sale of the seat has been consummated, no provision of the constitution or rule of the exchange stands in the way of the assignee. The

interest which passed to the trust company here by reason of the assignment was the right to receive the proceeds *when they became available* after the payments enumerated *supra.* When they became available, the lien attached. (See *Ketcham* v. *Provost,* 156 App. Div. 477, 484, affd. 215 N. Y. 631; *Stevens* v. *Coolidge,* 154 App. Div. 884, affd. 211 N. Y. 604; *Wrede* v. *Gilley,* 132 App. Div. 293; *Clute* v. *Loveland, supra.*) In *Stevens* v. *Coolidge* (*supra*) a brokerage partnership of Stow & Co. discontinued its business in April, 1907, because of inability to meet its obligations. There were but two partners and a seat was in the name of Coolidge. In 1908 Stow and Coolidge borrowed from the plaintiff in order to obtain money to effect a settlement with their creditors. As security Coolidge pledged and assigned his property interests in the membership and the proceeds of the sale thereof. In 1910 plaintiff brought action *to establish and foreclose a lien on the proceeds* of the membership, joining as parties defendants the two partners and the exchange, praying for a judgment which should declare and fix plaintiff's lien and decree the sale of the membership by the exchange. After the commencement of suit, a brankruptcy proceeding was instituted against Coolidge, and the trustee in bankruptcy appeared in the action. Judgment was entered declaring the lien and directing that the surplus of the proceeds (after payment of exchange debts) be paid to plaintiff.

The lien of the trust company here was an inchoate equitable lien which did not become *perfected* under the circumstances disclosed *until* the proceeds of the sale of the seat became available after the claims of the exchange and its members were satisfied. (*Ketcham* v. *Provost, supra*; *United States* v. *Texas,* 314 U. S. 480, 488.)

The cases relied upon by the respondents are not controlling. *Benedict* v. *Ratner* (268 U. S. 353) involved an assignment, as collateral, of accounts receivable under which the debtor was permitted to apply moneys paid upon such accounts to his own uses until demand was made by the assignee. The assignment was held to be fraudulent and void as to creditors because dominion was continued in the debtor " inconsistent with the effective disposition of title and creation of a lien " (p. 363). In the instant case there was not the reservation of a dominion which permitted the diminishing of the value of the membership

in the exchange and of the seat, but, on the contrary, an agreement " to maintain said membership and seat free of claim and of the New York Stock Exchange or any firm to which any member of the New York Stock Exchange belongs or to anyone else." In *Matter of M. J. Hoey & Co.* (19 F. 2d 764) there liability for the payment of any obligation to any other member was an agreement by the owner of a New York Stock Exchange seat to hold it in trust for one who loaned him the purchase price. Again there was the reservation, not found here, in the owner, of the right to diminish the value of the security by incurring debts to other members of the exchange. The court there also suggested that since there was continuation of ostensible ownership, the agreement would be fraudulent as to *customers* of the member. Here there are no debts due customers. Moreover, full notice of the assignment was given to the exchange. In *Zartman* v. *First National Bank* (189 N. Y. 267) a mortgage of shifting stock, which had not been acquired when the mortgage agreement was made, was held to be void where the mortgagor was permitted to sell the shifting stock for his own benefit. In *Schwabacher* v. *Ehrich* (168 Misc. 869, affd. 254 App. Div. 847, leave to appeal denied 279 N. Y. 813), no notice of any assignments had been given to the exchange or to Schwabacher & Co. The only opinion written was by the trial court and the statement therein that New York Stock Exchange membership could not be assigned under any circumstances was not a necessary holding in view of the facts there presented. The finding in the *Schwabacher* case that the rules of the exchange forbade a pledge of a seat is not applicable here, since there is no such provision in the exchange constitution and no exchange rule in evidence forbidding assignments. An examination of the briefs on the application for leave to appeal discloses that the finding there was based upon a circular issued by the exchange to prospective members. The trial court there further found that the rules of the exchange provided that every member who was a partner was required to declare in the partnership agreement that his membership was contributed to the firm and that the proceeds thereof should be considered as a firm asset in the event of its insolvency; that the partnership articles contained such an agreement made by the assignor Ehrich when he became a member of the firm and that it was in effect when he made the

two assignments in controversy which were executed by him after he had granted an option to Schwabacher & Co. to purchase his seat and had received payment in full. The findings of fact, affirmed by the Appellate Division, were there sustained by the evidence and there was nothing for this court to review.

That brings us to the next questions presented which involve the claims of the United States for $21,409.88 for income taxes for the years 1933 and 1941, and of the State of New York for $2,295.36 for income taxes for the years 1933 and 1937. We shall consider first the claim of the United States.

Section 3466 of the United States Revised Statutes (U. S. Code, tit. 31, § 191) reads as follows: " Whenever any person indebted to the United States is insolvent, or *whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied;* and the priority established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

The statute does not create a *lien* in favor of the government (*Bramwell* v. *U. S. Fidelity Co.,* 269 U. S. 483, 488). It simply provides for a priority in *payment.* The purpose of the statute is " to secure adequate public revenues to sustain the public burden." (*United States* v. *Emory,* 314 U. S. 423, 426.)

The trust company urges that its lien was created before there were any Federal tax claims against the decedent. In other words, that when the lien became perfected there was relation back to the time of its creation. That contention has been held to be without merit, in *New York* v. *Maclay* (288 U. S. 290, 293): " Against mortgagees and purchasers a lien perfected afterwards may take effect by relation as of the date of the inchoate lien through which mortgagees and purchasers became chargeable with notice. The doctrine of relation will not divest the United States of the preference that accrued when receivers were appointed."

The right of the United States to its statutory priority under section 3466 arose at the moment of the death of the assignor,

when ownership in the seat and in the membership in the exchange passed to the administratrix of his insolvent estate. (See *Dunphy* v. *Callahan,* 126 App. Div. 11, affd. 194 N. Y. 587; *Matter of Hearns,* 214 N. Y. 426, 429.) That long antedated the perfecting of the trust company's lien.

Perhaps it should be pointed out to avoid misunderstanding that, even if the lien had been perfected prior to decedent's death, it still might not be a " specific " lien within the meaning given to that term by the Federal courts when dealing with the priority of the United States under section 3466 over the statutory lien of State taxes, where no specific property has been seized and appropriated to the satisfaction of the lien or set apart from the general property of the debtor. (*United States* v. *Texas,* [BYRNES, J.], *supra,* 487, 488; *New York* v. *Maclay, supra; United States* v. *Waddill Co.,* 323 U. S. 353; *Matter of Lincoln Chair & Novelty Co.* [LEHMAN, J.], 274 N. Y. 353, 357–359.) Thus, in *United States* v. *Texas (supra)* in referring to a provision of a State statute that all gasoline taxes due by any distributor to the State " shall be a preferred lien, first and prior to any and all other existing liens, upon all of the property of any distributor, devoted to or used in his business as a distributor * * * ", the court said that the lien created was nothing more than an inchoate and general lien, and " did not of its own force divest the taxpayer of either title or possession. It could not become specific until the exact amount of the taxes due had been determined, and it could not be enforced without the assistance of the courts " (pp. 484, 488). The court was referring to a *statutory* lien for taxes which did not become specific, as against the United States under section 3466, even though its amount were determined, until by appropriate action specific property was appropriated and set apart and the taxpayer divested of title or possession of it by the sovereign. Only then might the statutory priority of the United States under section 3466 be avoided. (*Matter of Lincoln Chair & Novelty Co., supra,* pp. 358, 359.) Thus, even the lien of a judgment has been held not to be such a specific lien as would deprive the United States of its priority under section 3466. (*Thelusson* v. *Smith,* 2 Wheat. [U. S.] 396.) There was also, of course, a *common-law* possessory specific lien for indebtedness for services performed on the specific chattel upon

which the lien was claimed. There the debtor was divested of possession. (Brown on Personal Property [1936]; § 107.) An *equitable* lien, however, may never be the basis for a possessory action (Pomeroy on Equity Jurisprudence [5th ed.], §§ 165, 1233), but is a charge against a particular item of property and thus has reference to a specific thing, although it does not divest the debtor of title or possession. Court action is necessary to reach the property or its proceeds.

When we come to the claim of the State for the income taxes of 1933 and 1937, different principles apply. This State, unlike the United States, has no general statutory priority as to debts due it. By our State Constitution of 1777, section XXXV, it was provided that "such parts of the common law of England, and of the statute law of England and Great Britain, and of the acts of the legislature of the colony of New York, as together did form the law of the said colony on the 19th day of April, in the year of our Lord one thousand seven hundred and seventy-five, shall be and continue the law of this state, subject to such alterations and provisions as the legislature of this state shall, from time to time, make concerning the same. * * * "

The State has succeeded to the Crown's prerogative right of priority. (*Matter of Carnegie Trust Co.*, 206 N. Y. 390, 396, 397; *Marshall* v. *New York*, 254 U. S. 380, 383, 384.) In *Matter of Carnegie Trust Co.* (*supra*) it was said (HAIGHT, J.), at p. 396: "We think it clear that at common law the king was entitled to preference in the payment of debts due to him from an insolvent before that of a subject. This is stated in 1 Coke on Littleton (131b). Under the statute (33 Hen. VIII, ch. 39, § 74) it was enacted that the king's debt shall, in suing out execution, be preferred to that of every other creditor who has not obtained judgment before the king commenced his suit. This apparently has remained the law of England down through and since the American Revolution. (*Giles* v. *Grover*, 9 Bing. 128.) * * * Inasmuch, therefore, as the claims or moneys due the king, for the support and maintenance of the government, whether derived from taxes or other sources of income, were preferred over the claims of others, it follows that under the first subdivision of the provision of the Constitution of 1777, quoted, such preference became a part of the common law of our state, and is so continued under our present Constitution."

In speaking of this prerogative priority of our State in *Marshall* v. *New York* (*supra*) the Supreme Court said (Brandeis, J.) at page 382, *et seq.:* " At common law the crown of Great Britain, by virtue of a prerogative right, had priority over all subjects for the payment out of a debtor's property of all debts due it. The priority was effective alike whether the property remained in the hands of the debtor, or had been placed in the possession of a third person, or was *in custodia legis.* The priority could be defeated or postponed only through the passing of title to the debtor's property, absolutely *or by way of lien, before the sovereign sought to enforce his right. Giles* v. *Grover,* 9 Bing. 128, 139, 157, 183; *In re Henley & Co.,* 9 Ch. D. 469. Compare *United States* v. *National Surety Co.,* decided by this court November 8, 1920, ante, 73. \* \* \* The legislature has never, in terms, limited its scope; and the courts have rejected as unsound every contention made that some statute before them for construction had, by implication, effected a repeal or abridgment of the priority. The only changes of the right made by statute have been by way of enlarging its scope in certain cases. Thus, while by the common law of England, *The King* (*in aid of Braddock*) v. *Watson,* 3 Price, 6, and by that of New York, *Wise* v. *L. & C. Wise Co.,* 153 N. Y. 507, 511, the priority does not obtain over *a specific lien created by the debtor before the sovereign undertakes to enforce its right,* the legislature of New York extended the prerogative right, so as to give certain taxes priority over prior incumbrances. An extension of this nature is found in § 197 of the Tax Law which declares in respect to the annual franchise tax, that ' Such tax shall be a lien upon and bind all the real and personal property of the corporation, joint-stock company or association liable to pay the same from the time when it is payable until the same is paid in full.' By reason of that provision the annual franchise tax takes priority over incumbrances on the corporate property. *New York Terminal Co.* v. *Gaus,* 204 N. Y. 512. Under the earlier law a debt for franchise taxes was not ' a technical lien on specific property ' and had been ordered paid out of monies in receivers ' hands. *Central Trust Co.* v. *New York City & Northern R. R. Co.,* 110 N. Y. 250, 259." (Emphasis supplied.)

The reason the court in that quotation twice referred to the creation of a lien by the debtor " before the sovereign sought to enforce his right " no doubt goes back to the leading case of *Giles* v. *Grover* (9 Bing. 128 [1832]), cited (*supra*) where it was said with reference to a crown debt (p. 139): " It is conceded, that the crown cannot avoid an equitable mortgage; *Casberd* v. *Attorney-General* [6 Price, 411]: or the lien of a factor; *The King* v. *Lee* [6 Price, 369]; or of a wharfinger: *The King* v. *Humphrey* [1 M'Cleland & Younge, 173]: or a *bona fide* assignment in trust for creditors; *The King* v. *Watson,* West on Extents, 115: or any other similar assignment or charge; because they are created when the debtor has legal power and authority to create them, and attach upon the goods before the process of the crown, and the crown can only take the goods subject to such liabilities as the debtor has legally created ", and again at page 156–157: " If, however, the right of the subject be complete and perfect before that of the king commences, it is manifest that the rule does not apply, for there is no point of time at which the two rights are in conflict; nor can there be a question which of the two ought to prevail in a case where one, that of the subject, has prevailed already. But if whilst the right of the subject is still in progress toward completion, the right of the crown arises, it seems to me that the two rights do come into conflict together at one and the same time, and that the consequence in that case is that the right of the crown ought to prevail." (See also, note, " State's Prerogative Right of Preference at Common Law ", 51 A. L. R. 1355, 1370, 1371.) That, of course, is apart from statute. The right of priority of the United States here depends on section 3466. (*United States* v. *State Bank of North Carolina,* 6 Pet. [U. S.] 29, 35.)

As pointed out in the *Marshall* case (supra, at p. 386) the right of priority has been likened to an equitable lien. Here the parties were in a court of equity — the Surrogate's Court. Action was brought by the trust company against the exchange and the administratrix *c.t.a.,* but discontinued by stipulation by which consent was given to the payment of the proceeds of the sale of the seat to the administratrix. Prior to the sale of the seat and the attachment of the equitable lien to the proceeds of sale, the sovereign State had not " sought to enforce his

[its] right ", although by statute, Tax Law, section 380, it could have issued a warrant and obtained the equivalent of the lien of a judgment by appropriate proceedings and then acted thereon. Since the parties were in a court of equity, equitable principles and rules govern which are not applicable against the United States by reason of its statutory priority under section 3466. (*United States* v. *Texas, supra*; *Matter of Lincoln Chair & Novelty Co., supra.*) As between the State and the trust company we have what may be likened to an inchoate lien in the former and in the latter a perfected lien. To hold otherwise would make an equitable lien, even though perfected, of no moment or value as against the State in the event of insolvency. An assignor of a chose in action would have his money twice — once when he assigned and again when the State collected his income taxes from the proceeds of the chose in action. To be successful here, the State was required to undertake to assert its rights — as it had the power to do — before the lien attached to the fund. The assignee of a thing in action acquires at once " an equitable ownership therein, as far as it is possible to predicate *property* or ownership of such a species of right; * * * " (Pomeroy's Equity Jurisprudence [5th ed.], § 168, p. 221). Where, as in this instance, the chose in action was turned into money and became available in the hands of the exchange for payment to the assignor's administratrix, the equitable lien attached to it immediately and equitable ownership of the fund passed to the trust company, needing but the action of a court of equity to enforce its right to payment. At that moment, the lien of the trust company, which was greater in amount than the proceeds of the sale of the seat, and of all the assets of the estate, became capable of perfection and so was perfected, and the trust company became a secured creditor. Prior to that time when, upon Gruner's death, his administratrix *c.t.a.* became the owner of the property in the seat and membership in the exchange (*Powell* v. *Waldron, supra*), as distinguished from the *proceeds of the sale* to which the trust company's lien later attached, section 3466 became applicable because the estate was insolvent, and such property in the seat and membership was thereafter subject to the rights of the United States under that statute.

The order and decree so far as appealed from, should be reversed, without costs, and the matter remitted to the Surrogate's Court for further proceedings not inconsistent with this opinion.

DESMOND, J. (dissenting in part.) I agree with Judge CONWAY's opinion except that I think the State, for its unpaid income taxes, is entitled to priority over the New York Trust Company. It is undisputable that the State of New York, as a sovereign, has a common-law right of priority, with respect to the payment of taxes, over all other creditors of the taxpayer except the United States (*Matter of Smith* v. *Meader Pen Corp.*, 255 App. Div. 397, 399, affd. 280 N. Y. 554; *N. Y. Terminal Co.* v. *Gaus*, 204 N. Y. 512; *Central Trust Co.* v. *N. Y. C. & N. R. R. Co.*, 110 N. Y. 250, 259; *Matter of Century Steel Co. of America*, 17 F. 2d 78; *Matter of Lincoln Chair & Novelty Co.*, 274 N. Y. 353, 356; *Matter of Carnegie Trust Company*, 206 N. Y. 390, 399). This prerogative right of the State does not depend on statutes and so we do not have to examine into the difference between, for instance, section 219-c of the Tax Law (as to franchise taxes) and section 377 of that Law (with respect to income taxes). Nor can the State be defeated by reference to section 380 of the Tax Law, which provides for the filing of a warrant, etc.

Even if it be the law that this sovereign right of the State must give way to a perfected lien of another creditor, I do not see how the trust company's lien can be considered to have been perfected as against the State of New York any more than against the United States of America. Both the trust company and the State came into the Surrogate's Court to assert their alleged priorities to payment out of a fund which was in the hands of the administrator of the debtor's estate. Neither the State nor the trust company had reduced the property to possession, and no part of the property had been set off to either. The trust company had no " specific prior lien ", by attachment, execution or otherwise (see *Wise* v. *Wise Company*, 153 N. Y. 507, 511). Even if the trust company's equitable lien could be considered to have been " perfected " when the proceeds of the sale of the seat became available, that time was subsequent to the accrual of the State's tax claim. Thus we had an insol-

vency proceeding with a claim filed by the trust company, as holder of an inchoate lien, and another claim filed by the State of New York for past due income taxes. I do not see anything in all that to defeat the State's undoubted sovereign right to priority over all creditors (except the United States, which has its own special, and paramount, statutory right to first payment).

LOUGHRAN, Ch. J., LEWIS and THACHER, JJ., concur with CONWAY, J.; DESMOND, J., dissents in part in memorandum; DYE and FULD, JJ., taking no part.

Ordered accordingly.