Matthew M. Levy, J.
This is a proceeding instituted under section 696 of the Civil Practice Act (see CPLR 5239), for the purpose of determining — that after judgment, execution and levy — the title and liens and priorities in respect of a lease of an apartment in a co-operative dwelling and the shares of corporate stock related thereto. The parties, as named initially or permitted to intervene, are: the record owner of the residential building (a stock corporation operated as a co-operative), the lessee of one of the co-operative apartments therein and the registered holder of the related stock certificate, his alleged assignee, a judgment creditor of the assignor; the New York State Tax Commission as alleged lienor vis-a-vis the judgment debtor, and the Sheriff of the City of New York who had levied on the execution issued by the judgment creditor. The cause was tried to the court without a jury, the parties waiving enumerated findings of fact and conclusions of law. The relevant facts adduced at the trial and the principal contentions of the parties follow.
On or about July 1, 1956, the respondent Feldman, with the unconditional consent of the landlord, Park-58 Corporation, *373 became the assignee from the then tenant stockholder of a proprietary lease expiring on September 30, 1999, in the co-operative residential dwelling, and the owner of the corporate stock relating thereto, and thereupon became the tenant-occupant-stockholder of the apartment. On March 7, 1963, the petitioner herein recovered a judgment in the sum of $35,000 against Feldman. Pursuant to an execution duly issued on March 21, 1963, a notice of levy and seizure pertaining to the lease and stock was, on March 25, 1963, served upon the judgment debtor and, on March 27, 1963, upon another respondent herein, the Park-58 Corporation, the lessor of the judgment debtor and the owner of the co-operative building. It has heretofore been held herein that these procedures were duly undertaken and carried out. This holding is the law of the case. (Fried v. Lakeland Hide & Leather Co., 14 Misc 2d 305, 308-309; Sufrin v. Arbeau, Inc., 24 Misc 2d 909, 914, stay pending appeal denied 10 A D 2d 554; Aacon Contr. Co. v. Herrmann, 27 Misc 2d 197, 199; Sorin v. Shahmoon Inds., 30 Misc 2d 429, 435.) (See footnote 1, at end of opinion.)
The respondent Master asserts, with the support of the respondent Feldman, that, at all times since August 23, 1957, she (the respondent Master) has been the assignee for value of the afore-mentiohed proprietary lease and related stock certificate, albeit that Feldman continued in occupancy of the premises and the stock certificate continued to be registered in his name. The petitioner disputes the validity of the alleged assignment and contends that ownership of the proprietary lease and shares of corporate stock was in Feldman at the time of entry of judgment and execution and levy thereon. The controverted facts and my findings on that issue will be adverted to later in this opinion.
The New York State Tax Commission, another respondent herein, duly filed tax warrants (bearing specified rates of interest) against the respondent Feldman in the office of the County Clerk of New York County on February 26, 1941 ($64.38), September 26, 1942 ($2,047.60), February 24, 1950 ($89.84) and February 28, 1960 ($53.06), by virtue of the judgment debtor’s undisputedly unpaid and past-due State income taxes. The State claims that, since the warrants were filed prior to the entry of judgment by the petitioner, the State is entitled — both at common law and by statute — to priority in the proprietary lease and corporate stock as against the petitioner.
The respondent Parlc-58 Corporation, the title owner of the entire premises, contends that it has a prior lien on the judg *374 ment debtor’s interest in the co-operative, based upon the provisions of the by-laws and the stock certificate to the effect that: “ The corporation shall at all times have a lien upon the shares of stock owned by each stockholder to secure the payment by such stockholder of all rents to become payable under the provisions of his proprietary lease and for all other indebtedness due from such stockholder to the corporation”. The lease further provided that the Park-58 Corporation should be reimbursed by the lessee for attorneys’ fees incurred by reason of a default by the lessee under the lease, and that the lessor shall have a first lien upon the shares of stock of the lessee for all indebtedness and obligations owing by such tenant. The respondent Park-58 Corporation claims that a default occurred here on April 5, 1963, when it notified the respondent Feldman that his lease was terminated because “ the shares of said stock owned by such Lessee [were] duly levied upon under Court Process.” (See lease, article III, par. First, subd. [b] [4].) On this basis the corporation asserts, more specifically, a first lien for reasonable attorneys’ fees in the stipulated amount of $500.
At the outset, the respondent Master is confronted with the contention of the petitioner that the claim of this respondent in this proceeding is barred by the Statute of Limitations. It is necessary, therefore, to note the applicable chronology of events as to that issue. On August 23, 1957, upon receiving a loan in the sum of $16,500 from Master, Feldman allegedly executed and delivered to Master an “ assignment [of the lease and certificate] to secure indebtedness” and a demand note made by Feldman to Master’s order for that sum with interest. On June 1, 1961, an instrument signed by Feldman enlarged the applicability of the security to include an additional alleged loan of $3,665. No interest has been paid thereon; no part of the principal has been paid; no demand has been made for payment. In March 1963, as hereinbefore noted, the petitioner recovered judgment against Feldman, docketed the same, and, pursuant to execution duly issued, the Sheriff, in March 1963, levied on the proprietary lease and share certificate — ■ serving Feldman and Park-58 Corporation with requisite notices of levy. The levy was treated as a default on the part of Feldman by the landlord (pursuant to the terms of the lease) on April 5, 1963, when it notified Feldman that his lease would be considered terminated on May 31, 1963. By order to show cause signed on May 23, 1963, upon the judgment creditor’s petition of May 22, 1963, this proceeding was commenced to determine title as against the respondent Master, who had *375 delivered her affidavit of claim herein to the Sheriff, in accordance with the statute (Civ. Prac. Act, § 696; CPLR 5239).
It has not been made plain on what theory it is that the petitioner bases her contention that the Master claim is barred by the Statute of Limitations. The clearest expression of the petitioner’s point in that regard is at page 10 of her third supplemental trial memorandum, in which she states that: “ To this date she [Master] has failed and refused to bring such an action against the judgment debtor herein [Feldman] and has made no demand for either payment of principal or interest ”. Thus, presumably, the petitioner takes the position that the Statute of Limitations precludes recovery by Master since the statute would begin to run from the date of the issuance of the demand note and expire before the institution of an action thereon by Master — and, in fact, no such action has ever been commenced.
No doubt, the statute begins to run from the date of a demand note and not from any demand thereon (McMullen v. Rafferty, 89 N. Y. 456, 458; Lyons Nat. Bank v. Moore, 14 A D 2d 488), but there does not, with equal force, appear to be any doubt that Master’s interposition of her claim in this proceeding, if before the six-year period expired, is sufficient. Section 11 of the Civil Practice Act provides that “ [t]he periods of limitation * * * must be computed from the time of the accruing of the right to relief * * * to the time when the claim to that relief is actually interposed by the party as a plaintiff or a defendant in the particular action or special proceeding.” (Now CPLR 203.)
It was held in Matter of City of New York (Harlem Riv. Drive) (278 App. Div. 122, affd. 303 N. Y. 828), a condemnation proceeding, that the owner of a mortgage involved therein, by serving his notice of appearance in such proceeding, claiming to be such owner, had duly interposed his claim, thereby stopping the running of the Statute of Limitations. And in the case of Matter of Purdy (73 N. Y. S. 2d 38, mod. in part on other grounds, 275 App. Div. 786, affd. 300 N. Y. 688) the court stated at page 43: “It is now well settled that the filing of a proof of claim with the legal representative of a decedent within the time permitted tolls the statute * * *. The contention that the filing of an affidavit by a contingent creditor pursuant to § 207 of the Surrogate’s Court Act is not the filing of a proof of claim sufficient to toll the Statute of Limitations is without merit. ’ ’
*376 The demand note here was delivered to Master on August 23, 1957, thus giving her until August 23, 1963, to interpose her claim (Civ. Prac. Act, § 48; CPLR 213, subd. 2). Her affidavit, with reference to the claimed assignment appears to have been filed with the Sheriff as early as May of 1963, and certainly was before the court no later than June 3, 1963, when a motion was argued before my learned colleague for an order directing a hearing to determine all of the issues herein, including the Master claim, which motion was granted on June 19, 1963.
No one contends that there is applicable any statute which would effectuate a bar in less than six years. If any other law be relevant, it would be for the foreclosure or enforcement of liens. Since there is no Statute of Limitations governing such an action, section 53 of the Civil Practice Act and CPLR 213 (subd. 1), covering cases in which no specific period is set, would govern. Under the Civil Practice Act, 10 years was the applicable period, but, under the CPLR, 6 years is the limit. It being obvious that the instant claim was interposed within 6 years, there is no necessity to determine the applicability of the 10-year provision; but it should be noted that CPLR 218 (subd. [b]) reads as follows:' ‘ "Where a cause of action accrued before, and is not barred when this article becomes effective, the time within which an action must be commenced shall be the time which would have been applicable apart from the provisions of this article, or the time which would have been applicable if the provisions of this article had been in effect when the cause of action accrued, whichever is longer.”
Moreover, if it be held that the pledge herein was valid, then, since a pledge is a possessory lien (McCoy v. American Express Co., 253 N. Y. 477, 482), the barring of the underlying debt by the Statute of Limitations would not bar an action on the lien. That was the holding in Hulbert v. Clark (128 N. Y. 295, 298) where it was stated that “ [i]t is a general rule recognized in this country and in England that when the security for a debt is a lien on property, personal or real, the lien is not impaired because the remedy at law for the recovery of the debt is barred.” In my view, the case of Matter of Isensee (7 A D 2d 224, affd. 7 N Y 2d 873) is not apposite, as it was confined to the situation where the lien was nonpossessory.
In short, I hold that the Master claim — be it legitimate in fact or valid in law or not — is not time-barred. The rights of all of the parties herein depend, then, upon the initial resolution of the issue as to who owned the stock and the lease at the time of the effective accrual of the rights of the other parties. *377 Was it Feldman, the judgment debtor and delinquent taxpayer, or was it Master, his purported assignee?
It is entirely clear to me that the Feldman-Master transaction, on the facts presented, transferred no interest to Master which would take precedence as against third parties. Firstly, assuming a bona fide transaction, such an assignment could not effectively be made without the consent of the Park-58 Corporation, as so provided by the terms of the lease which were expressly incorporated in the stock certificate. (See footnote 2, at end of opinion.) It is undisputed that consent was never given. The requirement of consent is considered a reasonable restraint upon alienation, and appropriate notice of such restriction is clearly effective, where, as here, the documents bear such notice (Personal Property Law, § 176; Penthouse Props. v. 1158 Fifth Ave., 256 App. Div. 685, mot. for lv. to app. to Ct. of App. granted 257 App. Div. 817). It must be borne in mind that we are here concerned with a co-operative apartment house, and as the court, in the Penthouse Props. case (supra, pp. 691-692) said in this connection: “ [T]he residential nature of the enterprise, the privilege of selecting neighbors and the needs of the community are not to be ignored. The tenant stockholders in a co-operative apartment building are concerned in the purchase of a home. Necessarily, therefore, the permanency of the individual occupants as tenant owners is an essential element in the general plan and their financial responsibility an inducement to the corporation in accepting them as stockholders. Under the ‘ Plan of Organization ’ each stockholder is entitled to vote upon the choice of neighbors and their financial responsibility. The latter consideration becomes important when it is remembered that the failure of any tenant to pay his proportion of operating expenses increases the liability of other tenant stockholders. Thus, in a very real sense the tenant stockholders enter into a relation not unlike a partnership, though expressed in corporate form. ° * * Although it is true that the corporation which holds title to the real estate is not organized in co-operative form, it is manifest from the conceded facts that it was organized as a vehicle for the establishment of a community of homes rather than for the purpose of pecuniary profit to the stockholders. The primary interest of every stockholder was in the long-term proprietary lease, alienation of which the corporation had the power to restrain.” (Cf. Note on “ Co-operative Apartment Housing ” — “ Restrictions on the Transfer of Co-operative Interests ”, 61 Harv. L, Rev. 1407, 1416-1420.)
*378 Similar reasoning was expressed in Weisner v. 791 Park Ave. Corp. (6 N Y 2d 426, 434), where the court said: “ The statute which prohibits discrimination in co-operatives because of race, color, religion, national origin or ancestry is not involved in this case. Absent the application of these statutory standards, and under the terms of the agreement between plaintiff [purchaser] and Gilbert [seller], there is no reason why the owners of the co-operative apartment house could not decide for themselves with whom they wish to share their elevators, their common halls and facilities, their stockholders ’ meetings, their management problems and responsibilities and their homes.”
Nor is that the sole fatal objection to the claim of the respondent Master. In her affidavit of May 17, 1963, she stated that on ‘ ‘ August 23, 1957, [the respondent] Sam H. Feldman executed and delivered to me a promissory note for $16,500, with interest at 6%, payable on demand, and to secure the same transferred and delivered his shares and proprietary lease on the co-operative apartment 8D at 470 Park Avenue, New York City.” The transfer was thus not an outright assignment. A valid assignment vests “ in the assignee a present right in the thing assigned.” (Donovan v. Middlebrook, 95 App. Div. 365, 367; see, also, Advance Trading Corp. v. Nydegger & Co., 127 N. Y. S. 2d 800, 801.) Hardly could this be considered to have been the intention of the parties here. Indeed, the very essence of the lease and stock was the apartment, and the respondent Feldman never vacated the apartment, never delivered possession to the alleged assignee, never paid rent to her, and continues to occupy the premises to this day. On the other side of the coin, the respondent Master never asked for possession of the apartment, never attorned as a tenant to the over-all landlord and never paid rent to it or demanded an occupant’s rent from Feldman.
True, the respondents Feldman and Master label the transaction as an “ assignment ’ ’, in that the writing was stated to be an “ Assignment as Security for Indebtedness ”, but semantics cannot avoid its obvious substance. At most, the transaction envisaged some kind of pledge or mortgage, with the pledgor or mortgagor remaining in possession. If so, title remained in Feldman (Keshishian Bros. v. Deverian, 279 App. Div. 324, mod. on another ground 280 App. Div. 910). A valid pledge requires that delivery of the pledged item be made to the pledgee (McCoy v. American Express Co., 253 N. Y. 477, mot. for rearg. den. 254 N. Y. 550). I am not convinced that there is sufficient here to substantiate a delivery even of the *379 indicia to Master. Possession of the documents — the lease and the certificate of stock — continued in Feldman’s attorney. It would be somewhat difficult to discern for whom he was actually holding these papers, in the event that a controversy arose between Feldman and Master.
Moreover, whether the lien created by the transaction is a pledge or a mortgage or an ‘' assignment as security for indebtedness ”, I hold that — in view of Master’s failure to prove an actual same-day delivery of the stock and lease to her, or to one who was clearly her exclusive agent for purposes of acceptance of delivery — it is, by virtue of section 230 of the Lien Law, void as against creditors of Feldman, for failure to give due record notice thereof. The statute is specific. Section 230 states, inter alia, that article 10, providing for the filing of chattel mortgages, shall not “ apply to the mortgage or pledge of or lien upon stocks or bonds mortgaged or pledged to secure payment of a loan, which stocks or bonds, by the terms of a written instrument creating such mortgage, pledge or lien and setting forth the conditions of such loan, are to be delivered to the lender on the day such loan is made, and every such mortgage, pledge or lien, of such securities, shall be valid as against creditors of such mortgagor or pledgor, provided, however, that if such securities are not delivered to the pledgee or mortgagee on the day such loan is made, the mortgage, lien or pledge therein intended to be created shall be absolutely void and of no effect as against the creditors of such mortgagor, pledgor or lienor unless such instrument, or a true copy thereof, is filed as directed in this article, on the day following the making of such loan ”.
Holding, as I have, in the circumstances proved before me and in the light of the conflict of the respective interests of the parties, that the transaction between Feldman and Master did not denude Feldman of his property rights in the apartment— i.e., the lease and the related stock certificate — so as to destroy the efficacy of the liens of the judgment creditor and of the tax collector, I must now determine, as between them, whose lien is superior.
The judgment lien of the petitioner and the tax liens of the respondent commission came into fruition, and this proceeding was instituted, while the Civil Practice Act was in force. On September 1, 1963, the CPLB became effective, and the cause was tried thereafter. But the submission of the State that the prior statute should be applied in accordance with the provisions of CPLB 10003 (which states that the Civil Practice Act should apply to further proceedings in pending actions where the court *380 determines that application of the Civil Practice Law and Buies “ would work injustice ”) while justified, is unnecessary.
As will hereinafter be seen, I do not, for the purpose of determining priorities, consider Feldman’s interest to be “ personal property”. Thus, CPLB 5234 (subd' [b]), cited by the petitioner, and in respect of which the respondent State Tax Commission has expressed concern, is inapposite, in that it deals with priority among execution creditors as to personal property. Considering, as I do, that Feldman’s interest is in a “ chattel real” or “real property” — a quasi-real property interest — I note that section 510 of the Civil Practice Act provides that a judgment for a sum of money becomes a lien against “the real property and chattels real * * * which the judgment debtor has at the time of so docketing” (emphasis supplied), and that CPLB 5203, adopting the substance of the foregoing provisions of section 510, and entitled ‘ ‘ Priorities and liens upon real property ”, does not state that docketing of the judgment creates a lien upon chattels real. But that is of no significance, since under CPLB 105 (subd. [p]), by express definition, “ chattels real ” are included in the meaning of the term ' ‘ real property ’ ’. There is thus no change in the prior law, under which a lien upon real property or chattels real is created by docketing (see 5 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 5018.01 [p. 50-237]).
Now let me consider another facet of legal analysis involved in this proceeding. It is clear that the rights of the State do not depend solely on statute, and exist independently thereof (Matter of Carnegie Trust Co., 206 N. Y. 390; Klinghoffer v. Peter’s Ridgewood, 111 N. Y. S. 2d 290; see, also, Riverhead Estates Civic Assn. v. Gobron, 206 Misc. 405). The respondent State Tax Commission’s rights therefore must be determined both from the standpoint of its common-law prerogatives and of their statutory status. The State, as a sovereign, has a common-law right of priority to have taxes due it paid before the payment of other debts. The leading case is Matter of Gruner (295 N. Y. 510) which holds that the State has succeeded to the Crown’s right of priority (see, also, Marshall v. New York, 254 U. S. 380). And laches or estoppel cannot be imputed to the State when acting in its sovereign capacity (Gibson v. Chouteau, 13 Wall. [80 U. S.] 92; Matter of Moss, 277 App. Div. 289), but that is not determinative of the issue. The very nature of the common-law right of priority must be recognized and understood in order to determine its efficacy and extent.
In Matter of Gruner (295 N. Y. 510, 524, supra) the court quoted with approval the following from the early English *381 decision of Giles v. Grover (9 Bing. 128, 156): “ If, however, the right of the subject be complete and perfect before that of the king commences, it is manifest that the rule does not apply, for there is no point of time at which the two rights are in conflict; nor can there be a question which of the two ought to prevail in a case where one, that of the subject, has prevailed already.” The Court of Appeals (per Conway, J.) further said (pp. 523-525): “ The priority could be defeated or postponed only through the passing of title to the debtor’s property, absolutely or by way of lien, before the sovereign sought to enforce his right. * * * As pointed out in the Marshall case (supra, at p. 386), the right of priority has been likened to an equitable lien. Here the parties were in a court of equity — the Surrogate’s Court. Action was brought by the trust company against the exchange and the administratrix c.t.a., but discontinued by stipulation by which consent was given to the payment of the proceeds of the sale of the seat to the administratrix. Prior to the sale of the seat and the attachment of the equitable lien to the proceeds of sale, the sovereign State had not ‘ sought to enforce his [its] right ’, although by statute, Tax Law, section 380, it could have issued a warrant and obtained the equivalent of the lien of a judgment by appropriate proceedings and then acted thereon. Since the parties were in a court of equity, equitable principles and rules govern which are not applicable against the United States by reason of its statutory priority under section 3466 [citations omitted]. As between the State and the trust company we have what may be likened to an inchoate lien in the former and in the latter a perfected lien. To hold otherwise would make an equitable lien, even though perfected, of no moment or value as against the State in the event of insolvency. An assignor of a chose in action would have his money twice — once when he assigned and again when the State collected his income taxes from the proceeds of the chose in action. To be successful here, the State was required to undertake to assert its rights — as it had the power to do — before the lien attached to the fund.” (Emphasis in original.)
It has been held that a judgment lien has priority over any equitable assignment, such an assignment being considered an equitable lien (Matter of City of New York v. Bedford Bar & Grill, 285 App. Div. 1202, affd. 2 N Y 2d 429). The court stated (p. 1203) that “ the issue of the priority of a judgment lien over an equitable assignment is not an open one in this court ”. Other cases also indicate the limitations put upon the State’s common-law right of priority. The State’s lien is subject to a specific lien of a private lienor, where the time when the *382 private lienor obtained his lien is prior to the time when the State asserted or enforced its lien.
Thus, in Matter of Carnegie Trust Co. (151 App. Div. 606, affd. 206 N. Y. 390, 396) the Court of Appeals stated: “We think it clear that at common law the king was entitled to preference in the payment of debts due to him from an insolvent before that of a subject. This is stated in 1 Coke on Littleton (131b). Under the statute (33 Hen. VIII, ch. 39, § 74) it was enacted that the king’s debt shall, in suing out execution, be preferred to that of every other creditor who has not obtained judgment before the king commenced his suit.” And in Wise v. Wise Co. (153 N. Y. 507, 511) when the court noted that the common-law right of priority of the State was always subject to the claim in which a prior specific lien has been obtained by the creditor, it was stated: ‘ ‘ that when a fund is in the hands of the court or the trustee of an insolvent person or corporation, a claim due to the government upon a debt or for taxes is entitled to a preference in certain cases, or under certain circumstances. * * * In this country the right of the government to be preferred in the distribution of such a fund exists, under the authorities, in two cases: (1) Where the preference is expressly given by statute as was the case in U. S. v. State Bank of North Carolina (supra) [6 Peters (31 U. S.) 29, 34].
“ (2) Where, before the fund has come to the hands of the receiver or trustee, a warrant or some other legal process has been issued for the collection of the tax or debt, and the fund has come to his hands impressed with a lien in favor of the government in consequence of the proceedings for collection * # *
“ But where there is no statute giving the preference, and no warrant or process has been issued for the collection of a tax on personal property, there is no controlling authority for preferring such a claim over specific prior liens in favor of creditors obtained by levy under attachments or executions. (Roraback v. Stebbins, 4 Abb. Ct. App. Dec. 100.) ”
In City and County of Denver v. Stenger (295 F. 809, 816) the United States Court of Appeals stated, in regard to the State’s common-law right of priority, that “ [t]his preference given by the common law was an inchoate right which attached only from and as of the time when it was properly claimed or asserted and did not affect or take precedence over liens which were fixed upon the property prior to that time and were then in force [citations omitted] ”.
*383 On the basis of the holding and reasoning in these cases, I am of the opinion that the State’s common-law right of priority is in the nature of an equitable or inchoate lien, which can be defeated by a lien arising in favor of a third party and perfected prior to the assertion or enforcement of the priority of the State. I am of the view, further, that by the docketing of her judgment and the issuance of an execution and by the levy consequent thereon, the petitioner had perfected her lien prior to the State taking action to enforce or assert its lien. (See Davis and Warshow v. S. Iser, Inc., 30 Misc 2d 528, 533-535.)
Those cases which in their broad holdings are apparently contrary to these thoughts involved other types of taxes or were otherwise distinguishable. Thus, in Matter of Smith v. Meader Pen Corp. (255 App. Div. 397, affd. 280 N. Y. 554), the tax involved was a franchise tax, which, by statute, creates a lien even prior to the filing of a warrant, and, moreover, according to Marshall v. New York (254 U. S. 380, supra) defeats even prior incumbrances. In Klinghoffer v. Peter’s Ridgewood (111 N. Y. S. 2d 290) the court decided the case on the basis of the legislation involved, which created a statutory lien as the tax fell due, as well as on the common-law right of priority. Furthermore, the court did not consider the nature of that right as here analyzed. In Matter of Franklin Auto Supply Co. v. Bellerose Motors (193 Misc. 667) the holding is apparently contrary to my view, since priority was given to the State of New York on the basis of its common-law right, although the State did not obtain its judgment or serve third-party subpoenas until after other creditors had done so. The learned court, however, did not indicate when the State’s lien first attached according to statute, or when it was asserted in proceedings or action, nor did it consider the inherent nature of the State’s common-law lien. (And, see, Witas v. Carlson, 201 Misc. 201.)
• The situation here, as I see it, is analogous to that in Matter of Gruner (295 N. Y. 510, supra). The petitioner in the instant case obtained a judgment and docketed it, creating a lien on the judgment debtor’s real property. The petitioner then had the Sheriff levy upon the lease and stock owned by the judgment debtor. Up to this point, the State had not made any attempt to assert or enforce any common-law right of priority it may have had. Clearly, before the petitioner obtained a judgment, she remained a general creditor and she would have been *384 defeated by the State’s prior common-law right. However, by obtaining a judgment, docketing it, issuing an execution and effectuating a levy, I hold her to have created a perfected lien which takes precedence over the inchoate or equitable lien of the State.
For, while it is true that a State has a common-law right of priority with respect to the payment of taxes over all other creditors of the taxpayer, except the United States (see Smith v. Meader Pen Corp., 255 App. Div. 397, 399, affd. 280 N. Y. 554, supra), this right is qualified, in that it does not obtain against a lien which arose before the State ever attempted to enforce that right. And that brings us to a consideration of the rights of the State Tax Commission under the statute.
Section 380 of the Tax Law initially provided that, upon filing by the State Tax Commission of a tax warrant, ‘ ‘ the amount of such warrant so docketed shall become a lien upon and shall bind the real and personal property and chattels real of the person against whom it is issued in the same manner as a judgment duly docketed in the office of such clerk.” The section also provided (and still does) that, upon such filing of a copy of a warrant, 1 ‘ the tax commission shall have the same remedies to enforce the claim for taxes against the taxpayer as if the people of the state had recovered judgment against the taxpayer for the amount of the tax.” When, however, section 380 was amended generally (L. 1938, ch. 193) it turned out that the first sentence quoted above read, at the times involved in this litigation, that the “ warrant so docketed shall become a lien upon the title to and interest in real property or chattels real of the person against whom it is issued ”. I agree with the analysis of the court in State Tax Comm. v. Rothenberg (166 Misc. 690, 696) that the exclusion of “ personal property ’ ’ from the statute was the result of careless draftsmanship and could not logically have reflected the legislative intent; but I do not go along with the proposition that, in applying the statute, I should ignore the omission. I point out that the error was later corrected in the new Personal Income Tax Law (Tax Law, art. 22, § 692), but to apply for the tax years commencing with 1963.
I hold, nevertheless, that even as then worded, the State was not thereby deprived of its statutory remedies in respect of a co-operative tenant’s interest in his residential apartment. For I am of the opinion that the proprietary lease — notwithstanding that a corporate stock certificate was issued in connection therewith — gave to the lessee what was in the nature of a quasi-real property interest, and, as such, the tax lien *385 attached upon filing (without more) even under the Tax Law prior to its recent amendment to include personal property.
Matter of Turner (36 Misc 2d 684), Matter of Schlesinger (22 Misc 2d 810) and Matter of Miller (205 Misc. 770) and like cases, holding- that these leases are “personalty”, deal with devolution of property for estate purposes and depend upon the intent of the testator and the construction of the will involved, and are thus inapposite as such, and do not at all go to the heart of the present problem. Similarly, a leasehold is a “ chattel real ”, and as such has been deemed “ personal property ” and not “ real estate ” within the meaning of the New York City Commercial Bent or Occupancy Tax Law (Ampco Print.-Advertisers’ Offset Corp. v. City of New York, 14 N Y 2d 11, 20-21).
I am, of course, aware that it was not until this year that the “ condominium” method of ownership — long- employed in a number of foreign countries, and recently in several of our own States, and which enables each occupant in a multiple residential building to own his own apartment outright — was adopted by the State of New York (L. 1964, ch. 82; see Berger, Condominium: Shelter on a Statutory Foundation, 63 Col. L. Rev. 987, 1011; articles entitled ‘ ‘ The Law of Condominium ’ ’, appearing on the front pages of the New York Law Journal from May 20, 1964 to and including May 26, 1964; Kerr, Condominium— Statutory Implementation, 38 St. John’s Law Rev. 1, 45). But a close examination of the status of a “ co-operative ” apartment dweller indicates that, although he may not buy and sell his own apartment as he sees fit, he nevertheless is “ vested with a valuable interest in real property. While the corporation held the legal title, yet, to all intents and purposes, the entire equitable estate was distributed proportionately among the owners of the apartments. It is unnecessary to assign a name to the interest thus created.” (Matter of Pitts, 218 Cal. 184, 191.) “ The primary interest of every stockholder was in the long-term proprietary lease * * *. The stock was incidental to that purpose and afforded the practical means of combining an ownership interest with a method for sharing proportionately the assessments for maintenance and taxes.” (Penthouse Props. v. 1158 Fifth Ave., 256 App. Div. 685, 692, mot. for lv. to app. to Ct. of App. granted 257 App. Div. 817, supra.)
The co-operative tenant has been considered as in the nature of an owner, not merely a naked lessee — so that, for purposes of summary proceedings, he has been regarded a landlord. (Curtis v. Le May, 186 Misc. 853, 856; 542 Morris Park Ave. Corp. v. Wilkins, 120 Misc. 48, 51; see Smith v. Feigin, 273 App. Div. *386 277, affd. 298 N. Y. 534; see, also, Susskind v. 1136 Tenants Corp., 43 Misc 2d 588, 591.) II is a matter of common knowledge, too, that the co-operators pay real estate taxes and mortgage interest for the space which is “leased” to them. (11 N. Y. Jur., Co-operative Associations and Corporations, § 82, p. 65.) And, based upon the theory of quasi-real property ownership, a co-operative tenant has certain tax advantages which are not accorded the ordinary tenant or the routine stockholder (United States Internal Revenue Code, 1954, § 216; New York Tax Law, § 360, subd. 12).
The term of the proprietary lease herein, as has been hereinbefore noted, expires in 1999. Estates for years are denominated as “chattels real” in section 33 of the Real Property Law. Thus it is that ‘ ‘ the interest of a lessee for years is a chattel real, charged with any judgment docketed against him; that his interest is subject to sale under execution; that if the unexpired term is for five years or more it must be sold on the execution the same as real property; that if its unexpired term is less than five years it must be sold the same as any other personal property.” (Henderson v. Tomb, 169 Misc. 737, 739; but see Matter of Ehrsam v. City of Utica, 37 App. Div. 272, 274.) The related provisions of article 43 of the Civil Practice Act dealing with “ Executions against Property ”, point to this conclusion. Section 708 provides that: “ The term ‘ real property ’ as used in * * * this article includes leasehold property, where the lessee or his assignee is possessed at the time of the sale of at least five years unexpired term of the lease ”. I conclude, therefore, that the stock-ownership of the co-operative lessee is collateral to and an implementation of the purposes of the long-term lease, and that the filing of the tax warrants attached to the judgment debtor’s lease — as liens upon a chattel real or quasi real property interest then owned by him or acquired thereafter.
In Hulbert v. Hulbert (216 N. Y. 430) a landmark case, it was held, inter alia, that a judgment upon being filed and docketed becomes a lien upon the real estate of the debtor, and that the lien attaches also to after-acquired property at the time of acquisition. And it is elementary that judgments are liens upon the realty in the order of their docketing. (White’s Bank of Buffalo v. Farthing, 101 N. Y. 344.) Thus it is that — as with other lien-protected creditors — where the State is first in time, it is normally first in right.
But filed, as the four tax warrants were, respectively — in 1941, 1942, 1950 and in 1960 — the State, by its inaction, must be held to have lost the preference to which it was entitled in respect of the first three of them. For section 380 of the Tax *387 Law emphatically places the State, upon filing of its warrant, on an equal parity with a judgment creditor who has docketed his judgment — but no greater status is accorded the State. Consequently, in pursuance of section 510 of the Civil Practice Act, the vitality of the first three tax warrants was spent 10 years after their respective filings. That statute provides, among other things, that a judgment ‘ ‘ which is docketed in a county clerk’s office * * * binds, and is a charge upon, for ten years after filing the judgment roll, the real property and chattels real, in that county, which the judgment debtor has at the time of so docketing it, or which he acquires at any time afterwards, and within the ten years.” (Civ. Prac. Act, § 510; see Importers and Traders’ Nat. Bank of N. Y. v. Quackenbush, 143 N. Y. 567; Hall v. City of Lockport, 90 Misc. 429 [involving lapse of a city tax lien]; see, also, CPLR 5203.) Although the State’s “judgment” for taxes due is still alive (Tax Law, § 381; cf. Civ. Prac. Act, § 31; but, cf. CPLR 211, subd. [b]), the State was here required to file a “ notice of levy ” in order to revive the liens which had become impotent. (Civ. Prac. Act, § 512; cf. CPLR 5235.)
Moreover, it would appear that the State has been barred by the Statute of Limitations from asserting the priority of the first three liens. Section 54 of the Civil Practice Act (CPLR 201) provides that the “limitations prescribed in this article for actions other than for the recovery of real property apply alike to actions brought in the name of the people of the state, or for their benefit, and to actions by private persons.” Section 53 of the Civil Practice Act is thus made applicable to the State, and it is the governing provision herein, since there is no specific Statute of Limitations relating to the enforcement of liens. As has been noted hereinbefore (when I was considering the matter of the Statute of Limitations as to the claim of the respondent Master) that section allowed 10 years within which to commence an action to enforce the lien, and, as also heretofore pointed out, the time limit is now six years (CPLR 213, subd. 1). The Statute of Limitations has thus run on the first three of the State’s tax liens.
The holding in L. K. Land Corp. v. Gordon (1 N Y 2d 465, cert. den. sub nom. Greenfield v. L. K. Land Corp., 352 U. S. 989), involving a real estate tax, is not contrary to the view here expressed, that the Statute of Limitations prescribed by the Civil Practice Act should be applied to the State when it attempts, as here, to enforce the present type of tax lien. The statutes in that case (New York City Charter, § 172, and New York City Administrative Code, § 415[l]-7.0) provided that the tax was to become a lien on the real estate and remain as *388 such until paid (see 1 N Y 2d 465, 468). These clear and specific clauses were held to take precedence over the general language of the Civil Practice Act. Indeed, in certain sections of the Tax Law itself it is provided that the Civil Practice Act relative to the limitations of time shall not apply to a proceeding brought by the State under a specified article of the Tax Law (e.g., § 219, in relation to the franchise tax). But there is no such provision in the income tax article of the Tax Law — indicating that the Civil Practice Act does apply to the State in the proceeding at bar.
Thus it is that I hold that, as between the petitioner and the State, the last tax warrant is the only one entitled to first priority. And, now, I shall consider the claim of lien of the landlord, the respondent Parlc-58 Corporation, and its assertion of a preference.
The petitioner, in her trial memorandum, had contended that Park-58, the owner of the multiple dwelling and Feldman’s lessor, does not have priority over the lien of the petitioner as a judgment creditor, and, moreover, that Park-58’s proper remedy is to proceed in an independent action. But, in her supplemental brief, she is apparently withdrawing her objection, stating that since the lessee-judgment debtor was in default by virtue of the levy, the landlord’s attorneys ’ fees are a proper charge in the event of a sale of the property interest of the judgment debtor-lessee.
Be that as it may, I do not agree that Park-58 must bring a separate suit. It is claiming a lien for attorneys’ fees based on the terms of the lease. It is not here seeking to evict its lessee. (See footnote 3, at end of opinion.) Therefore, it is not only proper and logical but permissible that its claim to a lien and its relative priority be determined in this proceeding, so that a complete adjudication may be had as to the controversies here set forth as among all the parties.
Section 176 of the Personal Property Law indicates that there is a right of the corporation to a lien upon the shares issued by it where the right thereto under its by-laws is stated upon the certificate of stock. There is such statement here in the following language, quoting from the relevant paragraph of section 3 of article V of the “ Extract from By-Laws ” printed on the back of the stock certificate: ‘ ‘ The corporation shall at all times have a lien upon the shares of stock owned by each stockholder to secure the payment by such stockholder of all rents to become payable under the provisions of his proprietary lease and for all other indebtedness due from such stockholder to the corporation, and to secure the performance by the stockholder of all the covenants and conditions of his proprietary lease.”
*389 But I must, in a sense, express a pejorative caveat which would give a somewhat deteriorative effect to the meaning of the word “ lien ” as used in this context. For I recognize that, in adopting the term “ lien ” (as expressed by the landlord and the lessee in the documents between them) I have perhaps oversimplified the issue here considered — to the detriment of a better understanding of this phase of the case. The essence of the claim of the respondent Park-58 is that its right to obtain prior payment of its expense for attorney’s services — out of the property involved — arose at the very moment of the levy by the judgment creditor on that property. That is to say, that the landlord’s contention is that the naked exercise by the judgment creditor of her right to attach the property of the lessee as a judgment debtor would, by virtue of the agreements between the landlord and the lessee, ipso facto, diminish that property or reduce its value. That is a difficult concept to accept, and I do not do so. On the contrary, I am of the view that the use of the word “lien” by the contracting parties cannot affect the rights of the attaching party, a stranger to their transaction.
Feldman has been the uninterrupted co-operative lessee of his apartment since 1956. This relationship could have been terminated at the instance of the landlord in accordance with the terms of the agreement, and pursuant to its notice of April 5, 1963 of desire to terminate on May 31, 1963, by the prosecution of appropriate legal proceedings (see lease, art. III, 1st par.). The document did not provide for automatic forfeiture or reverter upon mere default and notice. Lien there is in favor of the landlord, by virtue of the terms of the lease, but no special priority is given to the landlord’s private lien by New York law.
I hold that this lien, reserved by the respondent Park-58 under its lease, is subordinate to the lien created by the judgment in the petitioner’s favor — because the landlord’s lien attached subsequent thereto. The latter lien for reasonable counsel fees attached only upon notification in April 1963 by the landlord of its recognition of the petitioner’s levy as a default by Feldman under the lease. Chronologically, too, therefore, the landlord’s lien is inferior to the State’s fourth .tax lien, which attached in 1960.
I have referred earlier to the seeming change of position of the petitioner in respect of the status of the landlord’s claim of lien for attorney’s fees. In support of that contention, the petitioner. cited the opinion of the Surrogate in Matter of Walton (37 Misc 2d 766). In that ease, unpaid arrears of Federal income taxes were assessed against Walton on July 6, *390 1956, and a notice of lien was duly filed on March 4, 1958. On March 20, 1958, Walton was personally injured by a negligently operated motor vehicle and admitted to a New York 'City hospital, where he received lengthy and costly treatment, for which the hospital subsequently rendered a bill. He instituted the usual action to recover damages for injuries suffered in the accident. The City Department of Hospitals duly filed a notice of lien for the amount of the hospital bill on Walton’s cause of action (Lien Law, § 189). Two years after the accident, Walton died and his administratrix was substituted as the plaintiff. No substantive claim was made for wrongful death. The personal cause of action for damages was compromised by leave of court. There was a balance remaining after payment of funeral and administration expenses and counsel fees, which sum constituted the sole asset of Walton’s estate. It was claimed by both the City of New York and the United States by virtue of their respective liens. The court indicated inter alia that the tax lien would be paramount in respect of a property right in the injured person, but since section 189 of the Lien Law required a deduction from any proceeds before an injured plaintiff would be paid the amount of his recovery (p. 770) —he could not, if living, have come into possession of the moneys due the hospital. Therefore the court decreed that the city was entitled to priority.
It is not necessary for me to determine whether the Surrogate’s decision in Walton supports the principle projected by the petitioner in aid of the respondent-landlord, for it appears that the decree in that case was unanimously reversed by the Appellate Division in 20 A D 2d 386. The court there held that Walton “ had a property interest [under New York law] in his right of action to which the Federal lien could and did attach ”, and that “the Government’s lien, having been duly assessed and filed, became ehoate upon the occurrence of the accident. It was thus first in time to .that of the hospital which subsequently became ehoate. Being the first in time, under the circumstances here present it became first in right ” (p. 391).
This opinion is the decision of this court on the facts and the law.
FOOTNOTES
Footnote 1. A point has come to mind that has not been raised by counsel, but I believe it worthy of mentioning.
Neither the Civil Practice Act nor the CPLR. nor any other statute (at least so far as I have been able to find) contains any provisions specifying the procedural steps to be taken when a levy is to be made by the Sheriff in respect of chattels real. Nor have I found any precise sections in either the Civil Practice Act or the CPLR having to do with the determination, after levy, of adverse claims to chattels real, although it is to be noted that CPLR 5239, dealing with *391 adverse claims, uses the word “ property” whereas Civ. Prac. Act, § 696 was expressly applicable only to “personal property”. It may be noted, too, that article 15 of the Real Property Law (since Sept. 1, 1963, of the Real Property Actions and Proceedings Law) applies generally to an “Action To Compel The Determination Of A Claim To Real Property.”
On this application, made by the petitioner as judgment creditor pursuant to Civ. Prac. Act, § 696 to try title to the property in question, it was determined by my learned colleague at Motion Term that the levy and execution had been properly made under section 687 of the Civil Practice Act and section 174 of the Personal Property Law, and therefore that Civ. Prac. Act, § 696 was applicable. Since, as I have said, this section pertains only to personal property, it is apparent that, in the preliminary procedures, the property in question has been dealt with as personalty.
However, while this is the law of the case as to procedural steps to bring the matter on to trial, that is not, in my view, a determination binding upon me after trial as to a resolution of the priorities involved herein; and, as will be seen hereinafter, it is my opinion that we are dealing here on that score with a chattel real.
Footnote 2. The stock certificate, on its face, provides that the shares represented by the certificate are “ transferable on the books of the Corporation by the holder thereof * * * upon surrender of this certificate properly endorsed but subject to the restrictions as to transfer as set forth on the face and reverse of this certificate.” It further provides that “ [t]his certificate is subject to the provisions of Paragraph Twelfth of the Certificate of Incorporation; Article V, Sections 2, 3 and 4 of the By-Laws of the Corporation; Article II, Section Sixth and Paragraphs 1, 2, 3, 4 and 5 thereof, Article IV, Section First and Subdivisions (a), (b), and (e) thereof and Article V, Section First and Paragraphs 1 and 2 thereof, contained in a certain proprietary lease entered into between the Corporation and its stockholders each of whom has assumed the same, copies of which provisions are set forth in full on the back of this certificate.”
The “Extract from [the] Certificate of Incorporation” reads as follows: “ Twelfth: Unless and until all proprietary leases which shall have been executed by the corporation shall have been terminated, the shares of stock which accompany each such proprietary lease shall be represented by a single certificate, and shall not be sold or transferred by the holder thereof or by the executors, administrators, successors or assigns of such holder except as an entirety to an assignee of such proprietary lease who has acquired the same after complying with and satisfying all the requirements of such proprietary lease in respect to the assignment thereof.”
The same provision also appears in section 3 of article V, of the by-laws of the corporation, and is printed on the back of the stock certificate as an “ Extract from By-Laws”. Also included in that “Extract” is section 2 of article V, which reads as follows: “ Section 2.— The shares of stock of the corporation shall be sold only in connection with and to such persons who shall have agreed to and actually entered into a proprietary lease to an apartment in the building owned and operated by the corporation.”
Section 4 of article V, similarly printed on the back of the stock certificate, provides that: “ Section 4. Transfers of shares shall only be made upon the books of the corporation by the holder in person or by power of attorney duly executed and witnessed and filed with the Secretary of the corporation, and on the surrender of the certificate or certificates of such shares. Shares of stock shall only be transferred in compliance with, and shall never be transferred in violation of, the provisions of the Charter of the corporation.”
The relevant portions of the “Extract from [the] Proprietary Lease”, also printed on the back of the stock certificate, are contained in articles II and V. *392 Article II, so far as pertinent here, reads as follows: “ sixth. *' * * Except as provided in this subsection and in Article IV of this lease, the Lessee shall not assign this lease, or any interest therein, and no such assignment shall take effect as against the Lessor for any purpose, unless and until all of the following requirements have been complied with and satisfied: 1. An instrument of assignment containing a covenant by the assignee or a separate instrument of assumption by which the assignee agrees to perform and comply with all the covenants and conditions of this lease to be performed or complied with by the Lessee on and after the effective date of said assignment must be executed and acknowledged by the assignee and delivered to the Lessor. 2. All shares of stock of the Lessor accompanying this lease must be transferred to the assignee. 3. All sums due from the Lessee, together with any amount necessary to cover reasonable legal and other expenses of the Lessor in connection with such assignment and transfer of stock, must be paid to the Lessor. 4. A consent thereto complying with the provisions of Article II, Section 3 of the By-Laws of the Lessor, or a written consent to such assignment, authorized by a resolution of the Board of Directors, or signed by a majority of the directors, or by lessees owning of record at least a majority of the capital stock of the Lessor accompanying proprietary leases then in force, must be delivered to the Lessor.”
Article V reads as follows: “ It is further mutually agreed as follows: “ first : The shares of stock of the Lessor held by the Lessee and allocated to the apartment have been acquired and are owned subject to the following conditions agreed upon with the Lessor and with each of the other proprietary lessees for their mutual benefit: (1) The shares represented by each certificate are transferable only as an entirety; (2) Neither the Lessee nor the Lessee’s personal representatives shall sell or transfer said shares except to the Lessor, or to an assignee of this lease after compliance with all of the provisions of paragraph sixth of Article II of this lease relating to assignments.”
Footnote 3. The record reveals that the landlord had instituted summary dispossess proceedings against the lessee, based upon the levy of execution by the Sheriff under the State tax warrants. However, in March of 1959, at the request of the judgment debtor, the State Tax Commission withdrew the four executions which theretofore had been sent to the Sheriff, so as to eliminate the technical basis upon which the landlord’s proceedings rested. The withdrawal of the executions, however, did not impair the efficacy of the warrants as liens, since the statute does not require execution or levy, but provides that the warrant becomes a lien upon filing, and thereupon has the same effect as a judgment (Tax Law, § 380).