**UNITED STATES of America, Plaintiff,**

v.

**Herbert E. MEYER et al., Defendants.**

**No. 70 Civ 3541.**

United States District Court, S. D. New York.

March 30, 1972.

Whitney North Seymour, Jr., U. S. Atty., for the Southern District of New York, New York City, for plaintiff; John F. McHugh, Asst. U. S. Atty., of counsel.

Bandler, Kass, Sherr, Sylvor & Schneer, New York City, for defendant Louis V. Keeler; Robert Sylvor and John K. Warsaw, New York City, of counsel.

Myer I. Kleinberg, New York City, for defendants Herbert E. Meyer and Marjory Meyer.

MEMORANDUM

MacMAHON, District Judge.

The defendant Herbert E. Meyer and his wife, Marjory Meyer, owe the United States government over $280,000 in tax-

es and interest. They concede this indebtedness. They have owed taxes for many years, some liens going back to as early as 1957. Indeed, in 1966 a judgment was rendered against them for over $132,000 of this indebtedness. Despite the fact that they own a cooperative apartment on Park Avenue and an interest in a joint venture in seven other apartments in the same building, the government has been ineffectually attempting to obtain payment of the taxes for a number of years.

The major stumbling block in the way of the tax collector is defendant Louis V. Keeler ("Keeler"), who claims a paramount lien against the Meyers' property as security for some $25,000 he lent them over a dozen years ago. Keeler is apparently not interested in obtaining repayment of the loan and has allegedly even allowed cash disbursements, in the amount of $9,000, to be made to the Meyers from the joint venture investment. He apparently asserts his secured interest only when the government attempts to foreclose on the Meyers' property.

The government now moves for summary judgment seeking to: (1) foreclose on the Meyers' property; (2) foreclose on a sum of money being held by the Clerk of the court; (3) obtain a determination concerning the priority of its liens; and (4) obtain a judgment on that portion of its tax liens which have not been previously reduced to judgment [1] (there does not appear to be any opposition to this portion of the motion).

The facts may be summarized as follows:

Prior to July 1959 (when Keeler first entered on the scene), the government had filed several tax liens against the Meyers. The total of these liens is listed variously in the government's papers, as follows:

$31,127.57 or
$26,021.19 or
$25,992.19.[2]

On July 23, 1959, it is alleged that Keeler loaned the Meyers $12,500. A demand promissory note, dated a day earlier (July 22, 1959), signed only by Herbert E. Meyer, is made payable to the order of "Southmont Corp." The papers on the motion do not identify Southmont Corp., but, presumably, it is an enterprise in which Keeler had an interest. On January 18, 1960, Keeler loaned the Meyers an additional $12,500. Between the time these two loans were made, the government had filed an additional lien in the amount of $1,169.89.

On February 1, 1960, the Meyers acquired their interest in the cooperative apartment and a lease thereunder. This was evidenced by a stock certificate covering 540 shares in the 993 Park Avenue Corporation, which took title to the building. There is a blank, unwitnessed assignment of the stock certificate to Keeler dated June 7, 1960. It is not clear exactly when this assignment was made.

A written agreement between the Meyers and Keeler, dated October 25, 1961, is the first formal written document evidencing the overall relationships between the parties, namely, that $15,000 had been loaned for the purchase of the cooperative apartment and $10,000 for the purchase of the interest in a joint venture to sell the undisposed apartments in the building. The agreement does not make reference to the date of the loans or explain the discrepancy between the amounts actually loaned ($12,500 twice) and the amounts attributed for each purpose. It merely

---

1. The government's papers, at some points, state that this lien in the amount of $147,955.57 was filed on October 29, 1965, and elsewhere state that the year was 1969. The taxes involved are for the tax year 1959.

2. No explanation is given for the discrepancy in the government's figures. However, it is clear that the government had liens validly filed for at least $25,-922.19 before July 1959.

describes the stock certificate as being delivered to Keeler, "endorsed in blank," subject to the repayment to Keeler of $15,000 "as evidenced by a certain demand promissory note for that amount."[3] The promissory note, bearing merely the date "1961," was signed by both of the Meyers.[4]

Between the earliest possible date of the assignment (June 7, 1960) and the date of the agreement (October 25, 1961), several more tax liens were filed. No notice of this assignment was given to the 993 Park Avenue Corporation until June 12, 1962, when a letter was sent by Keeler. The lease in question requires the approval of the corporation before an assignment of interest can be made. The stock certificate states clearly on its face that the shares represented by it are subject to the provisions of the lease, *inter alia*, which:

"  .   .   . limit and restrict the title and rights of any transferee thereof.

\*  \*  \*  \*  \*  \*

All the shares represented by this Certificate are transferable only as an entirety and only to an assignee of such Proprietary Lease approved in the manner therein provided."

It is further stated that a transfer of the stock is subject to all indebtedness owed to the corporation, which may refuse to consent to same until such has been paid.[5]

As indicated earlier, a part of the government's tax lien was reduced to

judgment in April 1966. The Meyers had apparently previously obtained and spent $9,000 from their interest in the joint venture in the other apartments. When an additional $5,133.66 became due and the government attempted to levy upon it, Keeler contested this and the moneys were paid into the court where they have remained ever since.

Defendants contend that the government's motion for summary judgment should not be granted because there are facts in dispute. However, the facts set forth in their Rule 9g statement are not facts at all but merely legal issues.[6] There are some facts in issue, particularly the date of the assignment of the cooperative apartment shares, but these factual issues only have to do with priority of some of the later filed government liens.

It is acknowledged by defendant Keeler that his secured interest in the cooperative apartments was not perfected until at least four months after the Meyers' interest therein arose. (Keeler contends that it was impossible to do so because the stock certificate was not actually issued until that time. However, it would appear that a secured interest could have been perfected in other ways. N.Y. Lien Law § 230 (repealed 1964), McKinney's Consol. Laws, c. 33.

■ Keeler argues that the delay in formalizing a secured interest for his loans does not affect its validity, nor does the fact that no lien was ever filed or recorded. That, however, is not the question. The issue is whether he took a secured interest which would displace

3. The two promissory notes amount to $27,500, while the loans were only for $25,000.

4. The demand notes (as opposed to possessory liens) may now be unenforceable because of the statute of limitations, McMullen v. Rafferty, 89 N.Y. 456 (1882), but that point has not been raised by the government and is not considered herein.

5. The corporation is not a party here, and no claims have been filed on its behalf.

6. "The Government is incorrect in asserting that there was no valid assignment of certain shares of stock to Louis V. Keeler. The Government is incorrect in asserting that Herbert E. Meyer had an attachable ownership inerest in certain shares of stock. The Government is incorrect in asserting that failure to file a notice of lien by Louis V. Keeler prevents him for taking the benefit of his assignment."

the previously filed government's tax liens. As will be shown hereafter, there clearly was no such preemption of the government's liens.

It is not disputed that the government's previously filed liens attached to after acquired property. Glass City Bank v. United States, 326 U.S. 265, 66 S.Ct. 108, 90 L.Ed. 56 (1945). (The stock certificate was collateral to the purpose of the lease, and the liens attached to the leasehold interest when acquired. See Matter of Lacaille, discussed *infra*.) Even if Keeler acquired a vested interest in both assets at the moment the Meyers obtained them, it would appear, absent other statutory authority, that there would be joint liens, in which case the tax lien would be superior. United States v. Graham, 96 F. Supp. 318, 321 (S.D.Cal.1951), aff'd sub nom. California v. United States, 195 F. 2d 530 (9th Cir.), cert. denied, 344 U.S. 831, 73 S.Ct. 36, 97 L.Ed. 647 (1952). Keeler's only claim for a priority would have to come from the New York laws concerning liens on chattels and real property, and commercial transactions.

The best exposition of New York law in a transaction of this nature appears in Matter of Lacaille, 44 Misc.2d 370, 253 N.Y.S.2d 937 (1964). The situation was quite similar, except that there were additional parties. Besides the cooperative apartment owner, the claimed assignee of the stock certificate, and the tax collector (there, the State of New York), there was also (*inter alia*) an intervening judgment creditor. (In this instance, the United States is a judgment creditor as well.)

■ In *Lacaille*, the assignment of the stock certificate was not recorded, and the certificate required the consent of the corporation to execute a transfer, which consent was not obtained.[7] The

court held that the transfer of the stock certificate was not valid because of the failure to obtain the permission of the corporation. Even if the assignment were consented to, it would not have been valid unless there were a present right in the thing assigned. Here, had there been a true assignment, Keeler would have been entitled to immediate occupancy of the premises. This clearly did not occur. As stated in *Lacaille*:

"At most, the transaction envisaged some kind of pledge or mortgage, with the pledgor or mortgagor remaining in possession. If so, title remained in Feldman (Keshishian Bros., Inc. v. Deverian, 279 App.Div. 324, 109 N.Y. S.2d 378, modified on another ground 280 App.Div. 910, 116 N.Y.S.2d 925). A valid pledge requires that delivery of the pledged item be made to the pledgee (McCoy v. American Express Company, 253 N.Y. 477, 171 N.E. 749, rearg. denied 254 N.Y. 550, 173 N.E. 861).

Moreover, whether the lien created by the transaction is a pledge or a mortgage or an 'assignment as security for indebtedness', I hold that—in view of Master's failure to prove an actual same-day delivery of the stock and lease to her . . . it is, by virtue of section 230 of the Lien Law, void as against creditors of Feldman, for failure to give due record notice thereof. The statute is specific." 44 Misc. 2d. 378–379, 253 N.Y.S.2d 948.

■ In *Lacaille*, there was no interest in a joint venture concerning other vacant apartments. With respect to the joint venture here, there were no documents evidencing ownership or other deed of title against which a secured interest could have been perfected. The Meyers had owed Keeler money since July 1959, and it was not until October

---

7. It is argued by Mr. Keeler that the failure of the corporation to respond adversely to his letter of June 12, 1962, advis-

ing of the assignment, constitutes an acceptance.

1961 that they prepared the agreement whereby they agreed to turn over their income from that syndicate to him, to the extent of the first $10,000, plus one-half of all profits thereafter. It would appear that all Keeler acquired was an equitable lien in the venture insufficient to divest the prior liens of the government, or even to survive the subsequent judgment lien of the government. Matter of City of New York v. Bedford Bar & Grill, Inc., 285 App.Div. 1202, 140 N. Y.S.2d 762 (1955), aff'd, 2 N.Y.2d 429, 161 N.Y.S.2d 67, 141 N.E.2d 575 (1957). In *Lacaille*, it was held that the subsequent judgment took priority over earlier equitable liens.

It follows from the foregoing that the government is entitled to foreclose its lien on the Meyers' cooperative apartment and to obtain $5,133.66 that is being held in the court registry.[8] On the facts presented, it is clear that the government is entitled to a minimum of $25,992.19. In the event that the foreclosure produces an amount in excess of that sum, a further hearing will be necessary to determine the disputed issues mentioned above and decide the order of distribution of additional funds.

Finally, there being no opposition, the government is entitled to have its additional lien, in the amount of $147,955.57, reduced to judgment.

Accordingly, the government's motion for summary judgment seeking to foreclose on the Meyers' property, to foreclose on the $5,133.66 held in the registry of this court, and to reduce its lien of $147,955.57 to judgment is granted. The government's motion for summary judgment seeking priority of its liens is granted with respect to its liens in the amount of $25,922.19, filed before July 1959, and is in all other respects denied.

So ordered.

---

8. There is no indication whether the syndicate has any remaining assets. If so, the Meyers' interest in it could also be foreclosed.